# EXHIBIT "A"



## General Civil Case Filing Information Form (Non-Domestic)

Court          County _Fulton_                              Date Filed _____
☒ Superior                                                   _____  MM-DD-YYYY
☐ State        Docket # _2012CV213789_

Plaintiff(s)                                    Defendant(s)
Michael J. Blonder, Bradley G. Johnson,         Illinois Union Insurance Company
Focus Land Investors, LLC and Focus             _____
Development, Inc.                               _____
_____                 _____

No. Plaintiffs __4__                            No. Defendants ___1___

Plaintiff/Petitioner's Attorney        ☐ Pro Se

Dever          Hayes         Michael _____
Last           First         Middle I.    Suffix

Bar# _219785_____

Dame           Genevieve     H. _____
Last           First         Middle I.    Suffix
Bar # _142229_

**FILED IN OFFICE**
APR 10 2012
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

**Check Primary Type (Check Only ONE)**
- ☒ Contract/Account
- ☐ Wills/Estate
- ☐ Real Property
- ☐ Dispossessory/Distress
- ☐ Personal Property
- ☐ Equity
- ☐ Habeas Corpus
- ☐ Appeals, Reviews
- ☐ Post Judgment Garnishment,
     Attachment, or Other Relief
- ☐ Non-Domestic Contempt
- ☐ Tort(If tort, fill in right column)
- ☐ Other General Civil
     Specify_____

**If Tort Case Type:**
(Check no more than **TWO**)
- ☐ Auto Accident
- ☐ Premises Liability
- ☐ Medical Malpractice
- ☐ Other Professional Negligence
- ☐ Product Liability
- ☐ Other Specify _____

**Are Punitive Damages Pleaded?**
☐ Yes ☒ No

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

FILED IN OFFICE
APR 10 2012
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

| | |
|---|---|
| MICHAEL J. BLONDER, | : |
| BRADLEY G. JOHNSON, | : |
| FOCUS LAND INVESTORS, LLC, and | : |
| FOCUS DEVELOPMENT, INC. | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| ILLINOIS UNION INSURANCE | : |
| COMPANY, | : |
| | : |
| Defendant. | : |

CIVIL ACTION
FILE NO. 2012CV213789

## COMPLAINT

COMES NOW Michael J. Blonder, Bradley G. Johnson, Focus Land Investors, LLC, and Focus Development, Inc., Plaintiffs in the above-styled action, and files this Complaint against Defendant Illinois Union Insurance Company, showing the Court as follows:

1.

Plaintiff Michael J. Blonder ("Blonder") is an individual residing within the State of Georgia.

2.

Plaintiff Bradley G. Johnson ("Johnson") is an individual residing within the State of Georgia.

3.

Plaintiff Focus Land Investors, LLC ("Focus Land") is a Georgia limited liability company.

4.

Plaintiff Focus Development, Inc. ("Focus Development") is a Georgia limited liability company.

5.

Defendant Illinois Union Insurance Company (the "Insurance Company") is a foreign corporation, not authorized to do business in the State of Georgia but doing business as a surplus line insurer pursuant to O.C.G.A. § 33-5-20 et. seq.

6.

Venue of this Court is proper pursuant to O.C.G.A. § 33-5-34.

7.

Pursuant to the Service of Suit Endorsement found within the Insurance Policy, Defendant Insurance Company's designated agent for service is Saverio Rocca, Assistant General Counsel, ACE USA Companies, 436 Walnut Street - WA04K, Philadelphia, PA 19106. Defendant Insurance Company may be served with second original summons and process at said address.

8.

Defendant issued to Plaintiffs the policy of insurance ("Insurance Policy") that is attached to Plaintiff's Complaint as Exhibit "A." The insurance policy is a Business and Management Indemnity Insurance Policy, providing coverage for individual insureds for any loss for alleged wrongful acts in their capacities as directors, officers or employees. The Insurance Policy also provides coverage for claims made against the Plaintiff companies.

2

9.

The Insurance Policy provided insurance coverage to Plaintiff Focus Development and Focus Management, Inc., as well as their subsidiaries, Directors, Officers and Employees as those terms are defined in the Insurance Policy for the policy period July 1, 2007 through and including June 30, 2008.

10.

Plaintiffs paid premiums in accordance with the Insurance Policy, and complied with all of the policy's terms, conditions and covenants.

11.

On or about April 3, 2008, Plaintiffs were covered under the Insurance Policy.

12.

On April 3, 2008, a lawsuit was filed by Tucker Athletic Center Holdings, LLC ("TA") against the Plaintiffs seeking rescission and restitution of an operating agreement between Plaintiff Focus Land and TA, as well as litigation expenses. The Complaint also asserted claims for breach of fiduciary duty and breach of the operating agreement of Springs Village Holdings, LLC (against Blonder and Johnson), and alter ego (alleging Focus Development is the alter ego of Focus Land). The Complaint was styled: *Tucker Athletic Center Holdings, LLC v. Focus Land Investors, LLC, Michael J. Blonder, Bradley G. Johnson, and Focus Development Inc*, Fulton Superior Court, Civil Action No. 2008CV148806. (the "Lawsuit").

13.

The Lawsuit was later referred to arbitration conducted by the American Arbitration Association.

3

14.

Plaintiffs timely placed the Insurance Company on notice of the Lawsuit and demanded that the Insurance Company provide coverage under the Insurance Policy for all defense costs and any loss sustained.

15.

On August 7, 2008 the Insurance Company denied coverage to the Plaintiffs under the Insurance Policy.

16.

Thereafter, in or about August 2008, counsel for Plaintiffs was advised by the Insurance Company that the Insurance Company would be providing coverage under the Insurance Policy for the Plaintiffs defense costs and loss sustained pursuant to the Lawsuit.

17.

Thereafter, counsel for the Plaintiffs was contacted by the Insurance Company's attorney with the law firm Hall Booth Smith, & Slover, P.C. ("Hall Booth") in Atlanta to discuss taking over the defense of the Lawsuit.

18.

Following that conversation, counsel for Plaintiffs sent Hall Booth the pleadings and other important documents pertaining to the Lawsuit.

19.

Despite repeated attempts to follow up with Hall Booth, Counsel for Plaintiffs did not hear back from Hall Booth or the Insurance Company regarding the Lawsuit.

20.

Then, on the Thursday before a Monday-scheduled mediation, the Insurance Company inexplicably reneged on its promise to provide coverage for the claims asserted in the Lawsuit under the Insurance Policy.

21.

Defendant Insurance Company failed and refused to pay Plaintiffs for their defense costs associated with the Lawsuit on the basis that the Insurance Policy did not cover the wrongful acts alleged in the Lawsuit.

## COUNT I
## Breach of Contract

22.

Plaintiffs hereby incorporate and reallege Paragraphs 1 through 21 of their Lawsuit as if fully set forth herein.

23.

Defendant breached the terms of the Insurance Policy by failing and refusing to pay Plaintiffs for the defense costs associated with the Lawsuit, as required under the Insurance Policy.

24.

As a proximate result of Defendant's failure and refusal to pay Plaintiffs for the defense costs associated with the Lawsuit, Plaintiffs incurred expenses of litigation, including reasonable attorney's fees.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing

25.

Plaintiff hereby incorporates and realleges Paragraphs 1 through 24 of her Lawsuit as if fully set forth herein.

26.

Defendant has a duty, implied by law, as insurer to deal fairly and in good faith with Plaintiffs as an insured.

27.

Defendant failed and refused to pay Plaintiffs for the defense costs associated with the Lawsuit without any valid legal or factual basis for doing so.

28.

Defendant knew at the time it failed and refused to pay Plaintiffs for the defense costs associated with the Lawsuit that it was doing so in violation of the Insurance Policy.

29.

Defendant misconstrued and misrepresented to Plaintiffs the relevant Insurance Policy information by asserting that the Insurance Policy terms could be construed to deny payment to Plaintiffs for the defense costs associated with the Lawsuit.

30.

Defendant failed to properly and thoroughly investigate the facts underlying the Lawsuit because it was not in Defendant's financial interest to do so.

31.

Defendant failed to investigate and research state law governing coverage under the Insurance Policy.

32.

By acting as described in Paragraphs 27 through 32 herein, Defendant breached its duty of good faith and fair dealing to Plaintiffs.

33.

Upon information and belief, Defendant has performed other actions, or omitted other actions, in breach of its duty of good faith and fair dealing to Plaintiffs, and Plaintiffs will amend this Lawsuit to allege such actions after initial discovery has been completed.

34.

As a proximate result of the above-described acts and omissions of Defendant, Plaintiffs have suffered loss of benefits under the Insurance Policy, and economic loss, in an amount to be proven at trial.

35.

As a proximate result of the above-described acts and omissions of Defendant, Plaintiffs had to retain counsel to secure amounts due under the policy.

## COUNT III
## Declaratory Relief

36.

Plaintiff hereby incorporates and realleges Paragraphs 1 through 35 of her Lawsuit as if fully set forth herein.

37.

There exists an actual controversy with respect to whether the Defendant's Insurance Policy provides liability coverage to Plaintiffs for obligations arising out of the above-noted Lawsuit.

38.

The controversy has placed Plaintiffs in a position of substantial uncertainty and insecurity with regard to the coverage of the Insurance Policy now and in the future.

39.

The ends of justice require that this Court declare the Insurance Policy provided coverage to Plaintiffs for obligations arising out of the above-noted Lawsuit.

40.

The Court's declaration that the Insurance Policy provided coverage to Plaintiffs for obligations arising out of the above-noted Lawsuit will terminate the uncertainty, insecurity and controversy between the parties with regard to the insurance policy coverage.

## COUNT IV
## Attorney's Fees and Expenses of Litigation

41.

Plaintiff hereby realleges and incorporates Paragraphs 1 through 40 of her Lawsuit as if set forth herein.

42.

The Defendant has acted in bad faith, been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense. As a result, Plaintiffs are entitled to recover from Defendant their costs incurred in this action, including without limitation, their attorney's fees.

## COUNT VI
## Bad Faith Refusal to Provide Coverage Under Insurance Policy

43.

Plaintiff hereby realleges and incorporates Paragraphs 1 through 42 of her Lawsuit as if set forth herein.

44.

Demand has been made and is made upon Defendant by Plaintiffs for coverage for the Lawsuit.

45.

As a result of Defendant's failure and refusal to provide coverage under the Insurance Policy by failing and refusing to pay Plaintiffs for the defense costs associated with the Lawsuit, Defendant has breached its contract of insurance with Plaintiffs.

46.

As a result of the Defendant's breach of contract, Plaintiffs have suffered irreparable harm, injury and damage.

47.

The conduct of Defendant in refusing to provide Plaintiffs coverage under the Insurance Policy for the defense costs associated with the Lawsuit presented constitutes bad faith pursuant to O.C.G.A. § 33-4-6, entitling Plaintiffs to receive as a penalty an additional 50% of Defendant's liability to Plaintiffs or $5,000.00, whichever is greater.

48.

As a result of the bad faith conduct of Defendant in refusing to provide coverage to Plaintiffs under the policy for the defense costs associated with the Lawsuit presented, Plaintiffs are entitled to reasonable attorney's fees pursuant to O.C.G.A. § 33-4-6.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

(a)     That this matter be tried before a jury;

(b)     That with respect to Count I, Plaintiffs be awarded damages in an amount to be proven at trial;

9

(c)     That with respect to Count II, Plaintiffs be awarded damages in an amount to be proven at trial;

(d)     That with respect to Count III, the Court enter an Order declaring that the Insurance Policy provided coverage to Plaintiffs for obligations arising out of the above-noted Lawsuit;

(e)     That with respect to Count IV, Plaintiffs be awarded their costs and expenses incurred in this action, including without limitation, their attorneys' fees;

(f)     That with respect to Count V, Plaintiffs be awarded a penalty in an amount not to exceed 50% of Defendant's liability to Plaintiffs or $5,000.00, whichever is greater, and reasonable attorney's fees pursuant to O.C.G.A. § 33-4-6; and

(g)     That Plaintiffs be awarded such other and further relief as this Court deems just and proper.

Respectfully submitted,
FRIEDMAN, DEVER & MERLIN, LLC

By: _____
        H. Michael Dever
        Georgia Bar No. 219785
        mdever@fdmlaw.com
        Genevieve H. Dame
        Georgia Bar No. 142229
        gdame@fdmlaw.com

5555 Glenridge Connector, NE          Attorneys for Plaintiffs
Suite 925, Glenridge Highlands         Michael J. Blonder, Bradley G. Johnson,
Atlanta, GA 30342-4728                 Focus Land Investors, LLC, and
(404) 236-8600                         Focus Development, Inc.

 Illinois Union Insurance Company

**Business and Management Indemnity Policy**

Declarations

This Policy is issued by the stock insurance company listed above ("Insurer").

THE EMPLOYMENT PRACTICES, DIRECTORS & OFFICERS AND COMPANY, FIDUCIARY, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONAL SERVICES COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS DISCOVERED DURING THE POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES UNLESS OTHERWISE PROVIDED HEREIN.  AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.

TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING.  PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.

Policy Number: BMI20044594

Item A. Parent Company: *Focus Management, Inc*
    Principal Address: 3243 Piedmont Road, Suite 325
        Atlanta, GA  30305

Item B. Policy Period:   From July 1, 2007   to   July 1, 2008
        12:01 a.m. local time at the Principal Address shown in Item A.

This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law and this (these) Insurer(s) is (are) not authorized to do business in Georgia

Item C. Coverage Section(s):

EMPLOYMENT PRACTICES

1.  Limit of Liability
    a. $ 2,000,000 aggregate for all **Loss**, subject to 1b and 1c immediately below,
    b. $ 1,000,000 additional aggregate for all **Costs, Charges and Expenses**, subject to 1c immediately below,
    c. $ 3,000,000 maximum aggregate for this Coverage Section

2.  Retention:        $ 10,000 each **Employment Practices Claim**
                      $ 10,000 each **Third Party Claim**

3.  **Continuity Date:** February 18, 2001

4.  **Third Party** Coverage: __X__ Yes _____ No

DIRECTORS & OFFICERS AND COMPANY

1.  Limit of Liability
    a. $ 2,000,000 aggregate for all **Loss**, subject to 1b and 1c immediately below,
    b. $1,000,000 additional aggregate for all **Loss** under Insuring Clause A1, subject to 1c immediately below,
    c. $ 3,000,000 maximum aggregate for this Coverage Section

SL-15190 (07/05)

Page 1 of 3

2. Retentions:
   $ 0 each **Claim** under Insuring Clause 1
   $ 0 each **Claim** under Insuring Clause 2
   $ 0 each **Claim** under Insuring Clause 3

3. **Continuity Date**: July 1, 2002

FIDUCIARY

1. Limit of Liability $ 1,000,000 maximum aggregate for this Coverage Section

2. Retention: $ 0 each **Claim**

3. **Continuity Date**: July 1, 2002

CRIME

1. Limit of Liability $ 1,000,000 maximum aggregate for this Coverage Section

2. Deductibles:
   $ 5,000 each **Single Loss**
   $ 0 each **Single Loss** for **Employees Benefit Plan** Coverage

3. **Employee Benefit Plan** Coverage Yes__X__ No____

Item D. Premium: $7,692

Item E. Discovery Period

TAX:_____ $ 307.68

POLICY FEE:_____

| | |
|---|---|
| 1. One (1) year | 100% of the premium |
| 2. Two (2) years | 125% of the premium |
| 3. Three (3) years | 150% of the premium |

As provided in subsection H of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased.

Item F. **Run-Off Period**

| | |
|---|---|
| 1. One (1) year | 110% of the premium |
| 2. Two (2) years | 112% of the premium |
| 3. Three (3) years | 115% of the premium |
| 4. Four (4) years | 120% of the premium |
| 5. Five (5) years | 122% of the premium |
| 6. Six (6) years | 125% of the premium |

As provided in subsection I of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased.

Item G. Notice under this **Policy** shall be given to:

ACE Westchester Specialty Claims
1325 Avenue of the Americas, 19th Floor
New York, NY 10019

Item H. Forms attached at **Policy** issuance:  SLGA2004, SL-15191, SL-15192, SL-15193, SL-15194, SL-15195, SL-20863, SL-19595, SL-19625, SL-19596, SL-19594, SL-19590, SL-19600, SL-19588, SL-20108, SL-15333, SL-19602, XS-U196d, SL-18349, SL-20106, TRIA DO, TRIA EPL, ALL-20887, SPEC001

IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be signed by its President and Secretary, and countersigned by a duly authorized representative of the **Insurer.**

GEORGE B. MULLIGAN, Secretary

JOHN J. LUPICA, President

DATE: 8/14/07

Authorized Representative

**GEORGIA**

**NOTICE TO INSURED:**

This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33-5.

SL GA 2004



**Business and Management
Indemnity Policy**

General Terms and Conditions

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows:

### A. SEVERABILITY OF GENERAL TERMS AND CONDITIONS

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

### B. DEFINITIONS

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions subsection of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions subsection and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2. **Company** means:
   a)  the **Parent Company**; and

   b)  any **Subsidiary**,

   and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

3. **Discovery Period** means one of the periods described in Item E of the Declarations which is elected and purchased pursuant to subsection H below.

4. **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

5. **Extended Period** means the **Discovery Period** or the **Run-Off Period**, if such provision is elected and purchased pursuant to subsections H or I, respectively, below.

6. **Insurer** means the insurance company providing this insurance.

7. **Parent Company** means the entity first named in Item A of the Declarations.

8. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item B of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item F of the Declarations, which is elected and purchased pursuant to subsection I below.

11. **Subsidiary** means:

a) any entity of which more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

(i) was so owned on or prior to the inception date of this **Policy** ; or

(ii) becomes so owned after the inception date of this **Policy**; and

b) any joint venture entity in which the **Parent Company**, or an entity described in a) above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a) above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

a) the acquisition by any person or entity of more than 50% of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

b) the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

## C.  LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES

1. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. The application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

2. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim**.

## D.  WARRANTY

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1. the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2. in the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio with respect to any **Insureds** who had knowledge of such misrepresentation or omission.

### E. CANCELLATION

1. By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2. This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Company** stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3. If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

### F. ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

### G. AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Parent Company** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Company** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

## H. DISCOVERY PERIOD

1. If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium or if the **Parent Company** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item E of the Declarations of the total premium for this **Policy**, or the total premium for the cancelled or not renewed Coverage Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item E of the Declarations after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Company** shall have the right to elect only one of the Discovery Periods set forth in Item E of the Declarations.

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H1 above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

3. In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4. The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

## I. RUN-OFF COVERAGE

In the event of a **Takeover**:

1. The **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item F of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item F of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "Run-Off Coverage"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the Run-Off Coverage, whichever is later, through the expiration date set forth in Item B of the Declarations.

2. The **Parent Company** shall have the right to elect only one of the periods designated in Item F of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

3. If a **Run-off Period** is elected and purchased:

   a) Subsection E, above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

   b) Subsection H, above, is deleted in its entirety; and

   c) the maximum aggregate Limit of Liability of the **Insurer** for each Coverage Section purchased and set forth on the Declarations shall be twice the otherwise applicable maximum aggregate Limit of Liability set forth in Item C of the Declarations for such Coverage Section; provided, however, the maximum aggregate Limit of Liability of the **Insurer** in connection with any one **Claim** shall be amount originally shown as the maximum aggregate Limit of Liability for each Coverage Section purchased and set forth on the Declaration.

SL-15191 (07/05)

**J.  ALTERNATIVE DISPUTE RESOLUTION**

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section; provided, however, that no such arbitration shall be commenced until at least 60 days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item A of the Declarations as the principal address of the **Parent Company**. The **Parent Company** shall act on behalf of each and every **Insured** in connection with any ADR process under this section.

**K.  TERRITORY**

Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

**L.  ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require.

**M.  ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT**

Except as provided in subsection J above, Alternative Dispute Resolution, no action shall lie against **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this **Policy**. No person or organization shall have any right under this **Policy** to join **Insurer** as a party to any action against the **Insureds** to determine their liability, nor shall **Insurer** be impleaded by the **Insureds** or their legal representative. No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.



**Business and Management
Indemnity Policy**

Employment Practices
Coverage Section

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

## A.  INSURING CLAUSES

1.  **Employee** Insuring Clause

**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for an **Employment Practices Wrongful Act** taking place prior to the end of the **Policy Period**.

2.  **Third Party** Insuring Clause

In the event **Third Party** Coverage is affirmatively designated in Item C of the Declarations relating to this Coverage Section, the **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for a **Third Party Wrongful Act** taking place prior to the end of the **Policy Period**.

## B.  DEFINITIONS

1.  **Claim** means any:

    a)  **Employment Practices Claim**; or

    b)  **Third Party Claim**.

2.  **Continuity Date** means the Continuity Date set forth in Item C of the Declarations relating to this Coverage Section.

3.  **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

4.  **Employee** means any person who was, now is or shall become:

    a)  a full-time or part-time employee of the **Company**, including voluntary, seasonal, and temporary employees;

    b)  any individual who applies for employment with the **Company**; and

    c)  any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

5. **Employment Practices Claim** means:

    a)  a written demand against an **Insured** for damages or other relief;

    b)  a civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

    c)  a civil proceeding against an **Insured** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document; or

    d)  a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of an **Employee** in their capacity as such. **Employment Practices Claim** does not include a labor or grievance proceeding, which is pursuant to a collective bargaining agreement.

6. **Employment Practices Wrongful Act** means any actual or alleged:

    a)  violation of any common or statutory federal, state, or local law prohibiting any kind of employment related discrimination;

    b)  harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

    c)  abusive or hostile work environment;

    d)  wrongful discharge or termination of employment, whether actual or constructive;

    e)  breach of an actual or implied employment contract;

    f)  wrongful deprivation of a career opportunity, wrongful failure or refusal to employ or promote, or wrongful demotion;

    g)  employment-related defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy;

    h)  wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures, solely as respects employment-related discrimination or harassment;

    i)  wrongful discipline;

    j)  employment-related wrongful infliction of emotional distress, mental anguish, or humiliation;

    k)  **Retaliation**;

    l)  negligent evaluation; or

    m)  negligent hiring or negligent supervision of others in connection with a) through l) above, but only if employment-related and claimed by or on behalf of any **Employee** and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

7. **Insured Persons** means all persons who were, now are or shall become:

    a)  a director or officer of the **Company**;

    b)  any **Employee**; and

SL-15192 (07/05)

c) the functional equivalent of a director, officer or **Employee** in the event the **Company** is incorporated or domiciled outside the United States.

8.  **Insureds** means the **Company** and any **Insured Persons**.

9.  **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

10. **Loss** means the damages, judgments, settlements, front pay and back pay, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds**. **Loss** does not include:

    a) taxes, fines or penalties;

    b) matters uninsurable under the laws pursuant to which this **Policy** is construed;

    c) punitive or exemplary damages, liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act or the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law, or the multiple portion of any multiplied damage award, except to the extent that such punitive, exemplary, or liquidated damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

    d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

    e) amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

    f) disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

    g) the costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any disabled person;

    h) the cost of creating or reinstating employment;

    i) any amount owed as wages to any **Employee**, other than front pay or back pay; or
    j) any amount for which the **Insured** is not financially liable or legally obligated to pay.

11. **Retaliation** means any actual or alleged response of any of the **Insureds** to:

    a) the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by any of the **Insureds** where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

    b) the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

    c) the filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law; or

    d) any legally-protected **Employee** work stoppage or slowdown.

12. **Third Party** means any natural person who is a customer, vendor, service provider, client, or other business invitee of the **Company**; provided, however, **Third Party** shall not include any **Employee.**

13. **Third Party Claim** means:

   a) any written demand for damages or other relief against an **Insured;**

   b) a civil judicial, administrative or arbitration proceeding against an **Insured** seeking damages or other relief, including any appeal therefrom; or

   c) a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   brought by or on behalf of a **Third Party** in their capacity as such.

14. **Third Party Wrongful Act** means any actual or alleged:

   a) harassment of a **Third Party** , including but not limited to any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment; or

   b) discrimination against a **Third Party**, including but not limited to any such discrimination on account of race, color, religion, age, disability or national origin.

15. **Wrongful Act** means:

   a) **Employment Practices Wrongful Act**; or

   b) **Third Party Wrongful Act.**

## C. EXCLUSIONS

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

1. for actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured; provided, however, this exclusion shall not apply to mental anguish, emotional distress or humiliation;

2. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   a) any **Wrongful Act**, fact circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

   b) any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts;**

3. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   a) the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

   b) any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

including without limitation any such **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion. Provided, however, this exclusion shall not apply to that part of any **Claim** under this Coverage Section where such **Claim** is for **Retaliation**.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

4.  for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law; provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**;

5.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any dishonest, deliberately fraudulent or criminal act; provided, however this exclusion shall not apply unless and until there is a final judgment against such **Insured** as to such conduct. If such excluded conduct is established through a final judgment, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges and Expenses**;

6.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

7.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    a)  any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including without limitation any investigation by the U.S. Department of Labor or the U.S. Equal Employment Opportunity Commission, filed or pending on or before the **Continuity Date**; or

    b)  any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including any investigation by the U.S. Department of Labor or the U.S. Equal Employment Opportunity Commission;

8.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance, or situation which any of the **Insured Persons** who were, now are, or shall be directors, officers, managers or supervisory employees, had knowledge of prior to the **Continuity Date** where such **Insured Persons** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

9.  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged responsibility, obligation or duty of any **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or pension benefits or similar law; provided, however, this exclusion shall not apply to any such **Claim** alleging **Retaliation**; or

10. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

## D. LIMIT OF LIABILITY AND RETENTIONS

1.  The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item C of the Declarations.  Such Retention shall be borne uninsured by the **Insureds** and at their own risk.  If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2.  As shown in Item C1 of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

    a)  The amount set forth in Item C1a relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss**, subject to additional payments for **Costs, Charges and Expenses** as further described in subsection b) immediately below.

    b)  The amount set forth in Item C1b relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Costs, Charges and Expenses** in addition to the limit described in subsection a) immediately above; provided, all payments for **Costs, Charges and Expenses** under the additional limits described in this subsection b) shall be excess of the limit described in subsection a) above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b).

    c)  The amount set forth in Item C1c of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability under this Coverage Section and the limit of liability set forth in C1a and C1b relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item C1c for this Coverage Section.

3.  All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim**, and such **Claim** shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

    a)  the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

    b)  the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to subsection E2 below.

4.  Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limit(s) of Liability, and payment of **Costs, Charges and Expenses** reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

## E. NOTIFICATION

1.  The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give to **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the

Insureds, or the expiration of the **Policy Period**, whichever is later. If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made against the **Insureds**, or the end of the **Extended Period**, whichever is later.

2.  If, during the **Policy Period** or the **Discovery Period**, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a)  a description of the **Wrongful Act** allegations anticipated;

    b)  the identity of the potential claimants;

    c)  the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

    d)  the identity of the **Insureds** allegedly involved;

    e)  the consequences which have resulted or may result; and

    f)  the nature of the potential monetary damages and non-monetary relief;

    then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3.  Notice to **Insurer** shall be given to the address specified in Item G of the Declarations for this **Policy**.

## F. SETTLEMENT AND DEFENSE

1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses**.

2.  The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3.  Notwithstanding subsection 1 above, in the event that any **Claim** is brought as a class action, and all or any part of such **Claim** involves any actual or alleged violation of the Fair Labor Standards Act of 1938, as amended, or any similar state law, regulation or code, then it shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any such **Claim**.

4.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

5.  If the **Insurer** does not have the duty to defend a **Claim**, then the **Insurer** shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

6. The **Insureds** ag. _ to provide the **Insurer** with all informa....i, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

7. If the Insurer does not have the duty to defend a **Claim**, the **Insurer** shall, on a quarterly basis, advance on behalf of the **Insureds** covered **Costs, Charges and Expenses**, which the **Insureds** have incurred in connection with **Claims** made against them, prior to disposition of such **Claims**. Any advancement of **Costs, Charges and Expenses** shall be subject to the condition that such advanced amounts shall be repaid to the **Insurer** by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled to coverage for such **Costs, Charges and Expenses** under the terms and conditions of this **Policy**.

## G. OTHER INSURANCE

1. For any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance; provided that with respect to that portion of an **Employment Practice Claim** made against any leased, temporary or independently contracted **Employee**, **Loss**, including **Costs, Charges and Expenses**, payable on behalf of such **Employee** under this Coverage Section will be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such insurance is specifically stated to be in excess over the Limit of Liability of this Coverage Section.

2. For any **Third Party Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such other insurance is specifically stated to be excess over the Limit of Liability of this Coverage Section.

## H. ALLOCATION

If the **Insurer** does not have the duty to defend a **Claim**, then the following subsections shall apply to such **Claim**.

1. If, in any **Claim** covered in whole or in part under this Coverage Section, the **Insureds** who are afforded coverage for such **Claim** incur **Loss** jointly with others, or incur an amount consisting of both **Loss** covered by this **Policy** and loss not covered by this **Policy** because such **Claim** includes both covered and uncovered matters, then the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained by the parties to covered and uncovered matters.

2. If there can be an agreement between **Insureds** and the **Insurer** on an allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis covered **Costs, Charges and Expenses**. If there can be no agreement on allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a current basis **Costs, Charges and Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated or arbitrated.

3. Any negotiated or arbitrated allocation of **Costs, Charges and Expenses** on account of a **Claim** shall be applied retroactively to all **Costs, Charges and Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs, Charges and Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of such **Claim** or any other **Claim**.



**Business and Management
Indemnity Policy**

Directors & Officers and Company
Coverage Section

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

### A. INSURING CLAUSES

1. The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3. The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against the **Company** during the **Policy Period** or, if applicable, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

### B. DEFINITIONS

1. **Claim** means:

   a) a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

   b) a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**;

   c) a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   d) a criminal proceeding against any **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   e) an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief; or

   f) a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document.

2. **Continuity Date** means the date set forth in Item C of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means:

   a) reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds

arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability; and

b) reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company**, to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**.

**Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company**.

4. **Directors and Officers** means any person who was, now is, or shall become:

   a) a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**;

   b) a person who was, is or shall become a full-time or part-time employee of the **Company**; and

   c) the functional equivalent of directors or officers of a **Company** incorporated or domiciled outside the United States of America.

5. **Insureds** mean the **Company** and the **Directors and Officers**.

6. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

7. **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1 or 2, or the **Company** under Insuring Clause 3. **Loss** does not include:

   a) taxes, fines or penalties;

   b) matters uninsurable under the laws pursuant to which this **Policy** is construed;

   c) punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

   d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

   e) any amount for which the **Insured** is not financially liable or legally obligated to pay;

   f) the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or

   g) any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

8. **Outside Entity** means:

   a) any non-profit company which is exempt from taxation under the Internal Revenue Code, as amended, in which any of the **Directors and Officers** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

   b) any other company specifically identified by endorsement to this **Policy**.

9. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

    a) any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity;

    b) any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

    c) the **Company**, but only with respect to Insuring Clause 3 of this Coverage Section.

## C. EXCLUSIONS

1. Exclusions Applicable to All Insuring Clauses

    **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    a) for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

    b) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i) any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

        (ii) any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

    c) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i) the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

        (ii) any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

    provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

    For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

    d) for any actual or alleged violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

e) brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, any **Outside Entity** or any person or entity that is an owner of or joint venture participant in any **Subsidiary** in any respect and whether or not collusive, unless such **Claim**:

    (i) is brought derivatively by a securities holder of the **Parent Company** and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any **Insured**;

    (ii) is brought or maintained by any **Insured** in the form of a cross claim, third party claim or other proceeding for contribution or indemnity which is part of, and directly results from a **Claim** that is covered by this Coverage Section; .

    (iii) is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**;

    (iv) is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**; or

    (v) is brought or maintained by any bankruptcy trustee or bankruptcy appointed representative of the **Company**;

f) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f)(i) shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

    (ii) the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f)(ii) shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

When f) (i) or (ii) apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges** or **Expenses**;

g) for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company** or Outside Entity, which payment without such previous approval shall be held to be in violation of law;

h) against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Directors and Officers** thereof:

    (i) before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

    (ii) occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

i) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

SL-15193 (07/05)

j) for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; provided, however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

    (i) such **Claim** is based on the service of any of the **Directors and Officers** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

    (ii) such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**; and

    (iii) such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

k) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

    (ii) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

l) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

m) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment–related matters brought by or on behalf of or on the right of an applicant for employment with the **Company**, or any of the **Directors and Officers**, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**;

n) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) any initial public offering of securities undertaken and consummated by the **Company**, including all activities in connection therewith;

    (ii) the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any **Wrongful Act** actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the **Company**; or

    (iii) any equity or debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $50 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3(b) of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in

connectio.. .with such issuance of securities and the ...ureds have paid the premium required by the **Insurer** for such coverage extension; or

o)  for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2.  Exclusions Applicable Only to Insuring Clause A3

**Insurer** shall not be liable for **Loss** on account of any **Claim**:

a)  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Company** would have been liable in the absence of such contract or agreement; or

b)  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

(i)  any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services; or

(ii)  any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.

Provided, however, the exclusions in 2a) and 2b) above shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such.

No Wrongful Act of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D.  **LIMIT OF LIABILITY AND RETENTIONS**

1.  The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item C of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2.  As shown in Item C1 of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

a)  The amount set forth in Item C1a relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A1 as further described in subsection b) immediately below.

b)  The amount set forth in Item C1b relating to this Coverage Section shall be an aggregate limit of liability for the payment of **Loss** under Insuring Clause A1 in addition to the limit described in subsection a) immediately above; provided, all payments for **Loss** under the additional limits described in this subsection b) shall be excess of the limit described in subsection a) above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b).

c)  The amount set forth in Item C1c of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The limit of liability set forth in C1a and C1b relating to

this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item C1c for this Coverage Section.

3.  All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

    a)  the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

    b)  the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to subsection E2, below.

4.  The Retention applicable to Insuring Clause 2 shall apply to **Loss** resulting from any **Claim** if indemnification for the **Claim** by the **Company** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of the **Company's** financial insolvency.

5.  Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limits of Liability and payment of **Costs, Charges and Expenses** reduce the Limits of Liability.  If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

## E.  NOTIFICATION

1.  The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**.  If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period**.

2.  If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a)  a description of the **Wrongful Act** allegations anticipated;

    b)  the identity of the potential claimants;

    c)  the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

    d)  the identity of the **Insureds** allegedly involved;

    e)  the consequences which have resulted or may result; and

    f)  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**.  No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3.  Notice to **Insurer** shall be given to the address shown under Item G of the Declarations for this **Policy**.

SL-15193 (07/05)

## F.  SETTLEMENT AND DEFENSE

1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses**.

2.  The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld.  The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

## G.  OTHER INSURANCE

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

## H.  PAYMENT PRIORITY

1.  If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then-remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss**, subject to such Limit of Liability, in the following priority:

    a)  first, the **Insurer** shall pay any **Loss** covered under Insuring Clause A1, in excess of any applicable Retention shown in Item C of the Declarations; and

    b)  second, only if and to the extent the payment under subsection 1 above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item C of the Declarations covered under any other applicable Insuring Clause.

    c)  Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Company**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Parent Company** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.



**Business and Management
Indemnity Policy**

Fiduciary Coverage Section

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

### A. INSURING CLAUSE

**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

### B. DEFINITIONS

1.  **Administration** means:

    a) counseling employees, beneficiaries or **Plan** participants with respect to any **Plan**;

    b) providing interpretations with respect to any **Plan**;

    c) handling records in connection with any **Plan**; or

    d) enrolling, terminating, or canceling employees under any **Plan**.

2.  **Claim** means:

    a) a written demand for damages or other relief against an **Insured**;

    b) a civil, administrative, regulatory or arbitration proceeding against any **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom; or

    c) a civil proceeding or formal investigation brought by the U.S. Department of Labor, the U.S. Pension Benefit Guaranty Corporation or any similar federal, state or local governmental body, including any appeal therefrom.

3.  **Continuity Date** means the date set forth in Item C of the Declarations relating to this Coverage Section.

4.  **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, overhead or benefit expenses associated with officers or employees of any of the **Insureds**.

5.  **Employee Benefit Plan** means any plan so defined by the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, or any rules and regulations promulgated thereunder.

6.  **Insured Persons** means:

    a) any natural persons who were, now are, or shall become a trustee, director, officer or employee of the **Sponsor Company** or **Plan**,

    b) any natural persons who were, now are, or shall become a fiduciary of any **Plan**; and

c) any natural persons for whose **Wrongful Acts** any of the **Insureds** are legally responsible.

7. **Insured Plan** means any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for employees of the **Sponsor Company**.

8. **Insureds** means:

   a) the **Sponsor Company**,

   b) any **Plan**,

   c) any **Insured Persons**; and

   d) any other natural person or entity who was, now are, or shall be acting as a plan administrator of any of the **Plans** at the written request and consent of the **Sponsor Company**.

9. **Interrelated Wrongful Acts** means all **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, cause, transaction or series of facts, circumstances, situations, causes, events or transactions.

10. **Loss** means monetary damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds**. **Loss** does not include:

    a) taxes, fines or penalties;

    b) matters uninsurable under the laws pursuant to which this **Policy** is construed; or

    c) punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds, Insurer**, this **Policy** or the **Claim** giving rise to such damages;

11. **Pension Benefit Plan** means any plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

12. **Plan** means:

    a) any **Sponsored Plan**, and

    b) any **Insured Plan**,
    established before or after the inception of this **Policy**.

13. **Plan Termination** means the termination, suspension, merger or dissolution of any **Plan**.

14. **Sponsor Company** means the **Company**.

15. **Sponsored Plan** means:

    a) any **Employee Benefit Plan, Pension Benefit Plan**, or **Welfare Benefit Plan** which is operated by the **Sponsor Company** for the benefit of the employees of the **Sponsor Company**;

    b) any other plan, fund or program specifically included as a **Sponsored Plan** by endorsement to this **Policy**; and

    c) any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder, sponsored by the

**Sponsor Company** for the benefit of the employees of the **Sponsor Company**, including any employee stock ownership plan;

provided, however, that the **Sponsored Plan** shall not include any multi-employer plan, as defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder.

16. **Welfare Benefit Plan** means any employee welfare benefit plan so defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder.

17. **Wrongful Act** means:

    a) with respect to a **Sponsored Plan**:

        (i) any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of the **Sponsored Plan** by the Employee Retirement Income Security Act of 1974, as amended, or by the Health Insurance Portability and Accountability Act of 1996, or any similar state or local common or statutory law, and any rules and regulations promulgated under either of these Acts;

        (ii) any other matter claimed against the **Sponsor Company** or any of the **Insured Persons** solely because of the service of the **Sponsor Company** or any of the **Insured Persons** as a fiduciary of any **Sponsored Plan**, including any actual or alleged violation of the Health Insurance Portability and Accountability Act of 1996 or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder; or

        (iii) any actual or alleged act, error or omission in the **Administration** of any **Sponsored Plan**, including any actual or alleged violation of the Health Insurance Portability and Accountability Act of 1996 or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder; and

    b) with respect to an **Insured Plan**, any actual or alleged act, error or omission in the **Administration** of such Insured Plan.

## C. EXCLUSIONS

1. **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    a) for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured.

    b) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i) any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this Policy is a renewal or replacement or which it succeeds in time; or

        (ii) any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

    c) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i) the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

(ii) any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

including without limitation any **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed).  **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

d) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, the failure to comply with any statutory or common law governing workers' compensation, unemployment, social security or disability benefits or any similar law; provided, however, this exclusion shall not apply to any actual or alleged obligation of any **Insured** pursuant to the:

(i) Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

(ii) Health Insurance Portability and Accountability Act of 1996, as amended;

e) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

(i) any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion e)(i) shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

(ii) the gaining of any profit, remuneration or financial advantage to which any **Insured Person** was not legally entitled; provided, however this exclusion e)(ii) shall not apply unless and until there is a final judgment against such **Insured Person** as to such conduct;

When e)(i) or (ii) apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

f) against any **Subsidiary** or any of the **Insured Persons** of a **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or any of the **Insured Persons** of a **Subsidiary**:

(i) before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

(ii) occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

g) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

h) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   (i) any prior or pending litigation, arbitration, or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before of the **Continuity Date**; or

   (ii) any fact, circumstance, situation, transaction, cause or event underlying or alleged in such litigation, arbitration, administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

i) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Plan Termination**; provided, however, that this exclusion shall only apply to those **Plans** which were the subjects of the **Plan Termination**;

j) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment–related matters; provided, however, this exclusion shall not apply to any **Claim** where such employment or employment-related matters involve actual or alleged violations of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder;

k) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**; or

l) for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

2. **Insurer** shall not be liable to make any payment under this Coverage Section, other than **Costs, Charges and Expenses**, on account of any **Claim**:

a) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except to the extent that liability would have attached to the **Sponsor Company** in the absence of such contract or agreement, or where the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which any of the **Plans** was established;

b) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or attempted reversion or payment of assets of any of the **Plans** to the **Sponsor Company**, or to any successor or assign of the **Sponsor Company**;

c) for or which seeks or constitutes fines or penalties or the multiple portion of any multiplied damage award, other than the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon any of the **Insureds** as a fiduciary under Section 502(i) or (l), respectively, of the Employee Retirement Income Security Act of 1974, as amended;

d) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, the failure to collect from the **Sponsor Company** contributions owed to any of the **Plans**, or the failure to fund a **Plan** in accordance with the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder, unless the failure is solely due to the negligence of any of the **Insureds**; or

e) which constitutes benefits due to or to become due under the terms of any **Plan** if such **Plan** complied with all applicable law, unless and to the extent that:

(i) the Insured is a natural person and the benefits are payable by such Insured as a personal obligation; and

(ii) recovery for the benefits is based upon a covered **Wrongful Act**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

**D. LIMIT OF LIABILITY AND RETENTION**

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item C of the Declarations.  Such Retention shall be borne uninsured by the **Insureds** and at their own risk.

2. The amount shown in Item C of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of **Insurer** under this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

   a) the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

   b) the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to subsection E2, below.

4. Payments of **Loss**, other than **Costs, Charges and Expenses**, by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are not part of, and are in addition to, the Limit(s) of Liability and payment of **Costs, Charges and Expenses** shall not reduce the Limit(s) of Liability.  If such Limit(s) of Liability are exhausted, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

**E. NOTIFICATION**

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period**.  If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period**.

2. If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a) a description of the **Wrongful Act** allegations anticipated;

   b) the identity of the potential claimants;

   c) the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

   d) the identity of the **Insureds** allegedly involved;

   e) the consequences which have resulted or may result; and

   f) the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by

the Insurer. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3.  Notice to **Insurer** shall be given to the address shown under Item G of the Declarations for this **Policy**.

## F.  SETTLEMENT AND DEFENSE

1.  It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted.

2.  The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

## G.  OTHER INSURANCE

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

## H.  WAIVER OF RECOURSE

**Insurer** shall have no right of recourse, including but not limited to rights of contribution and subrogation, against any **Insureds** with respect to any **Claim** if this Coverage Section has been purchased by that **Insured**, with the exception of any of the **Plans**.



Business and
Management Indemnity
Policy

Crime Coverage Section

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

## A.  INSURING CLAUSES

### 1.  Employee Theft Coverage

**a)  Employee Theft**

The **Insurer** will pay for loss of or damage to **Money, Securities and Other Property** resulting directly from **Theft** or **Forgery** by any identifiable **Employee** while acting alone or in collusion with others.

**b)  Employee Benefit Plan**

In the event **Employee Benefit Plan** Coverage is affirmatively designated in Item C of the Declarations relating to this Coverage Section, then the **Insurer** will pay for loss to the **Employee Benefit Plan** of **Money, Securities and Other Property** resulting directly from **Theft** by an identifiable **Employee** while acting alone or in collusion with others.

### 2.  Premises Coverage

**a)  Loss of Money and Securities**

The **Insurer** will pay for loss of **Money and Securities** resulting directly from **Robbery, Safe Burglary**, disappearance or destruction thereto, or **Theft** while such **Money** or **Securities** is or are upon the **Premises** of the **Insured** or any **Banking Premises**.

**b)  Loss of or damage to Other Property**

The **Insurer** will pay for loss of or damage to **Other Property** resulting directly from an actual or attempted **Robbery** or **Safe Burglary** within the **Insured's Premises**; provided, that the **Insured** is the owner of the **Premises** or is legally liable to the owner of the **Premises** for such loss or damage.

### 3.  Transit Coverage

The **Insurer** will pay for loss of or damage to **Money, Securities and Other Property** outside the **Premises** in the care of a **Messenger** or armored motor vehicle company resulting directly from the actual destruction, disappearance, misappropriation, actual or attempted **Robbery** or **Theft**.

### 4.  Forgery, Alteration and Counterfeit Money

The **Insurer** will pay for direct loss resulting from **Forgery, Alteration**, or counterfeiting of or in any **Financial Instrument** and from counterfeit **Money**.

For the purposes of this Insuring Clause 4, mechanically reproduced or facsimile signatures shall be treated the same as handwritten signatures.

### 5.  Computer Theft and Funds Transfer Fraud

The **Insurer** will pay for loss of or damage to **Money** and **Securities** owned by the **Insured** resulting directly from **Computer Theft** or **Funds Transfer Fraud**.

## B. DEFINITIONS

1. **Alteration** means the material modification of a **Financial Instrument** for a fraudulent purpose by a person other than the person who prepared the **Financial Instrument**.

2. **Banking Premises** means the interior of the portion of any building(s) occupied by any **Financial Institution**, or similarly recognized place of safe deposit, including any night depository chute or safe maintained by any **Financial Institution**.

3. **Computer Theft** means the unauthorized and fraudulent taking of **Money** and **Securities** directly through the use of a computer located anywhere.

4. **Employee** means:

   a) any natural person while in the service of the **Insured**, including sixty (60) days after termination of service; provided the **Insured**:

      (i) compensates such person directly by salary, wages or commissions; and

      (ii) has the right to direct and control such person while performing services for the **Insured**;

   b) any natural person furnished temporarily to or hired by the **Insured**:

      (i) to substitute for a permanent **Employee** who is on leave or vacation;

      (ii) as part-time help or to meet seasonal or short-term workload conditions;

      provided that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

   c) any student or volunteer who performs services for the **Insured** without compensation; and

   d) any director or trustee of the **Insured**, but only while performing acts within the scope of the usual duties of an **Employee**.

**Employee** does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character.

5. **Employee Benefit Plan** means a benefit plan subject to the requirements of the **Employee** Retirement Income Act of 1974, as amended, which is sponsored by the **Company** for its **Employees**.

6. **Financial Institution** means:

   a) a banking, savings or thrift institution; or

   b) a stock broker, mutual fund, liquid assets fund or similar institution at which the **Insured** maintains a **Transfer Account**.

7. **Financial Instruments** means checks, drafts or promissory notes, or similar written promises, orders or directions to pay a sum certain in **Money**, that are:

   a) made or drawn upon by the **Insured**; or

   b) made or drawn upon by one acting as the **Insured's** agent, or that are purported to have been so made or drawn upon.

SL-15195

Financial Instrument shall also mean written instruments required in conjunction with any credit, debit or charge card issued to the **Insured**, or any **Employee** on behalf of the **Insured**; provided, that the **Insurer** shall not pay for loss arising from any credit, debit or charge card if the **Insured** or the **Employee** has not fully complied with the provisions, conditions or other terms under which the card was issued.

8. **Forgery** means the signing of the name of another person or organization with intent to deceive. **Forgery** does not mean a signature which consists in whole or in part of one's own name signed, with or without authority, in any capacity, for any purpose.

9. **Funds Transfer Fraud** means:

    a) electronic, telegraphic, cable, telefacsimile, teletype or telephone instructions fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** to any person, entity or account, which instructions purport to have been transmitted by an **Insured** but were in fact fraudulently transmitted by someone other than the **Insured** without the **Insured's** knowledge or consent; or

    b) fraudulent written instructions, other than those covered under Insuring Clause 4, issued to a **Financial Institution** directing such institution to debit a **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which instructions purport to have been issued by an **Insured** but were in fact fraudulently issued, forged or altered by someone other than the **Insured** without the **Insured's** knowledge or consent.

10. **Insured** means the **Company** and any **Employee Benefit Plan**.

11. **Messenger** means any partner or **Employee** of the **Insured** or other natural person duly authorized by the **Insured** to have custody for the purposes of conveying property, while said person has custody of the property outside the **Premises**.

12. **Money** means:

    a) currency, bullion, coins and bank notes; and

    b) travelers checks, register checks and money orders held for sale to the public.

13. **Other Property** means any tangible property other than **Money** and **Securities** that has intrinsic value but does not include any property excluded under this Crime Coverage Section.

14. **Premises** means the interior of that portion of any building that is occupied by the **Insured** in conducting its business.

15. **Robbery** means the taking of property of the **Insured** from the care and custody of the **Insured**, an **Employee**, or any person who holds such property under authorization by the **Insured**, by one who has:

    a) caused or threatened to cause such person bodily harm; or

    b) committed an unlawful act witnessed by such **Insured**, **Employee**, or person.

16. **Safe Burglary** means the taking of the **Insured's Money, Securities** or **Other Property** from within a vault or safe located within the **Premises** by a person making entry into such vault or safe, and any vault containing the safe, when all doors thereof are duly closed and locked by at least one combination or time lock, provided that such entry shall be made by actual force and violence upon the exterior of:

    a) a door or doors of such vault or safe, and any vault containing the safe, if entry is made through such doors; or

SL-15195

b) the top, bottom, or walls of such vault or safe, and any vault containing the safe through which entry is made, if not made through such doors.

17. **Securities** means negotiable and non-negotiable instruments representing **Money** or **Other Property** and includes:

a) stock certificates, tokens, tickets, revenue and other stamps, whether represented by actual stamps or unused value in a meter, in current use; and

b) evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Insured**.

**Securities** does not mean **Money**.

18. **Single Loss** means all loss caused by, resulting from or involving an act or event, or a series of related acts or events, whether or not involving one or more specific persons.

19. **Theft** means the unlawful taking of **Money, Securities,** or **Other Property** from the **Insured** to the deprivation of the **Insured**. For purposes of Insuring Clause 1b) only, **Theft** means the unlawful taking by any **Employee** of **Money, Securities** or **Other Property** that was intended to be paid as benefits by an **Employee Benefit Plan**.

20. **Transfer Account** means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** can initiate the transfer, payment or delivery of **Money** or **Securities**:

a) by means of electronic, telegraphic, telefacsimile, cable or telephone instructions communicated directly or through an electronic funds transfer system; or

b) by means of written instructions, other than those covered under Insuring Clause 4, establishing the conditions under which such transfers are to be initiated by such **Financial Institution** through an electronic funds transfer system.

## C. EXCLUSIONS

The Insurer will not pay for:

1. loss resulting from the acts, or based on the authority, of any government, or any agency, department or division thereof;

2. loss that is an indirect or consequential result of any act or **Single Loss** covered by this Crime Coverage Section;

3. loss of potential income, including but not limited to, interest and dividends, not realized by the **Insured** because of a loss covered under this Crime Coverage Section;

4. loss of trade secrets, confidential processing methods, or other confidential or proprietary information of any kind;

5. loss resulting from pollution, nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident;

6. loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution or any related act or incident;

7. loss resulting from any dishonest or criminal act committed by any of the **Insured's Employees**, directors or trustees whether acting alone or in collusion with others and whether committed while performing services for the **Insured** or otherwise, except to the extent coverage is afforded under Insuring Clause 1;

8. loss resulting from any dishonest or fraudulent act committed by the **Insured** whether acting alone or in collusion with others;

SL-15195

9.  loss, or that part of any loss, the proof of which involves in any manner a profit and loss computation or comparison, or a comparison of inventory records with an actual physical count; provided, however, that where the **Insured** establishes wholly apart from such comparison that it has sustained a loss covered under Insuring Clause 1 and it has identified the **Employee** involved, then it may offer its inventory records and actual physical count of inventory in support of the amount claimed;

10. loss resulting directly or indirectly from trading, whether or not in the name of the **Insured** and whether or not in a genuine or fictitious account, except to the extent coverage is afforded under Insuring Clause 1 as a consequence of **Employee Theft**;

11. loss of any intangible property;

12. expenses and costs incurred in the defense of any legal proceedings brought against the **Insured**, or to fees, costs or expenses incurred or paid by the **Insured** in prosecuting or defending any legal proceeding;

13. expenses and costs incurred by the **Insured** in investigating or establishing the existence of or the amount of any loss covered under this Crime Coverage Section;

14. damages of any type for which the **Insured** is legally liable, except direct compensatory damages arising from a loss covered under this Crime Coverage Section;

15. loss of **Money, Securities** or **Other Property** while in the custody or control of the United States Postal Service or other parcel delivery service;

16. loss for which the **Insured** could recover under a contract with an armored motor vehicle company or under any insurance or indemnity carried by or for the benefit of customers of an armored motor vehicle company;

17. loss due to fire however caused;

18. loss resulting directly or indirectly from **Computer Theft** or **Funds Transfer Fraud**, except and to the extent coverage is afforded under Insuring Clause 1 or 5;

19. loss resulting directly or indirectly from **Forgery, Alteration** or counterfeiting  except and to the extent coverage is afforded under Insuring Clause 1 or 4;

20. loss of or damage to **Money, Securities** or **Other Property** as a result of kidnap, ransom or other extortion payments surrendered to any person because of a threat to do:

    a) bodily harm; or

    b) damage to the **Premises** or **Other Property** owned by the **Insured**;

    except and to the extent coverage is afforded under Insuring Clause 2;

21. loss resulting from any civil, criminal or other legal proceeding in which the **Insured** is adjudicated to have engaged in "racketeering activity" as that term is defined in 18 United States Code 1961, et seq., as amended; or

22. loss resulting from damage to any property, safe, vault, or to the **Premises** or its exterior, by vandalism or malicious mischief.

## D.  OTHER CONDITIONS

  1.  Joint **Insured**

    a) If there is more than one **Insured**, the **Parent Company** that is named first in the Declarations will act for itself and for every other **Insured** for all purposes of this Crime Coverage Section. If the first **Parent Company** ceases to be covered, then the next

Parent Company will become the first Parent Company for the purposes of this subsection 1.

b) If any Insured, or any partner, officer or director of that Insured, has knowledge of any information relevant to this Crime Coverage Section, that knowledge is considered knowledge of every Insured.

c) An Employee of any Insured is considered to be an Employee of every Insured.

d) If a loss is sustained by more than one Insured, the Insurer will not pay more for loss sustained by more than one Insured than the amount the Insurer would have paid if all loss had been sustained by one Insured.

2.   Discovery

The Insurer will pay for loss sustained by the Insured through acts committed or events occurring at any time and discovered by the Insured during the Policy Period. Discovery of loss occurs when an officer, director, Insurance Manager or Risk Manager first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this Crime Coverage Section has been or will be incurred, even though the exact amount or details of such loss may not then be known. Discovery also occurs when the Insured receives notice of an actual or a potential claim against it alleging facts that, if true, would constitute a covered loss under this Crime Coverage Section.

3.   Other Insurance

This insurance does not apply to loss recoverable or recovered under any other insurance or indemnity. However, if the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this Crime Coverage Section will apply to that part of the loss, other than that falling within any deductible amount, not recoverable or recovered under the other insurance or indemnity. This Crime Coverage Section will not apply to the amount of loss that is more than the applicable Limit of Liability as stated in the Declarations.

4.   Interests Covered; Ownership of Property

This Crime Coverage Section is for the exclusive benefit of the Insured. It provides no rights or benefits to any other person or organization. The property covered under this Crime Coverage Section is limited to Money, Securities or Other Property that the Insured owns.

5.   Termination as to any Employee

This Crime Coverage Section shall terminate as to any Employee from and after the time that the Insured or any officer or director thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, whether such act be committed before or after the date of employment by the Insured.

If, prior to the issuance of this Crime Coverage Section, any fidelity insurance in favor of the Insured or any predecessor in interest of the Insured and covering one or more of the Insured's Employees shall have been cancelled as to any of such Employees by reason of the giving of written notice of cancellation by the Insurer issuing such fidelity insurance, whether the Insurer or not, and if such Employees shall not have been reinstated under the coverage of such fidelity insurance or superseding fidelity insurance, Insurer shall not be liable on account of such Employees unless the Insurer shall agree in writing to include such Employees within the coverage of this Crime Coverage Section.

6.   Termination of this Coverage Section

This Coverage Section shall terminate in its entirety:

a) thirty days after the receipt by the Parent Company of a written notice of termination from the Insurer;

b) upon receipt by the **Insurer** of a written notice of termination from the **Parent Company**;

c) at such other time as may be agreed upon by the **Insurer** and the **Parent Company**;

d) upon the voluntary liquidation or dissolution of the **Company**;

e) upon the appointment of:

   (i) a receiver, trustee, or other fiduciary of the property of the **Company**;

   (ii) a committee for the dissolution thereof; or

f) as to any of the **Insureds**, other than the **Company**, upon the appointment of:

   (i) a receiver, trustee or other fiduciary of the property of any such **Insureds**, or

   (ii) a committee for the dissolution thereof;

   whichever occurs first.

## E. PROVISIONS AFFECTING LOSS SETTLEMENT

1. Limit of Liability

   The amount shown in Item C of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of the **Insurer** under all Insuring Clauses for this Coverage Section.

2. Deductible

   The **Insurer** will not pay for loss resulting from a **Single Loss** unless the amount of such loss exceeds the applicable **Single Loss** deductible shown in the Declarations. The **Insurer** will then pay the amount in excess of such deductible, subject to the applicable Limit of Liability of this Crime Coverage Section.

3. Duties in the Event of Loss

   After the **Insured** discovers a loss or a situation that may result in a loss of **Money**, **Securities** or **Other Property** that may be covered under this Crime Coverage Section, the **Insured** must:

   a) provide to the **Insurer**, at the address set forth in Item G of the Declarations, written notice of such loss as soon as practicable, but in no event later than sixty (60) after such discovery;

   b) submit to an examination under oath at the **Insurer's** request and give the **Insurer** a sworn statement of the answers of the **Insured**;

   c) provide the **Insurer** with a sworn proof of loss within one hundred eighty (180) days after discovery which shall provide, at a minimum:

      (i) the date and circumstances surrounding discovery, including the name(s) of the person(s) making the discovery;

      (ii) details of how the subject loss occurred or will occur;

      (iii) the amount of actual loss known and an estimate of the total loss expected to result; and

      (iv) a description of all known sources of recovery to reduce the loss;

SL-15195

d) provide the **Insurer** with all information, assistance and cooperation as the **Insurer** may reasonably request in the investigation and settlement of any claim;

e) notify the police or other appropriate law enforcement authority(ies) if the **Insured** has reason to believe that loss covered by any Insuring Clause(s) involves a violation of law; and

f) keep accurate records of all covered property so that the **Insurer** can verify the amount of any claimed loss.

4. Valuation

a) Subject to the Limit of Liability, the **Insurer** will pay for:

  (i) loss of **Money**, but only up to and including its face value. In the event of loss of **Money** in any currency other than United States dollars, the **Insurer** may, at its option, pay for loss of such **Money**:

  (a) at face value in the **Money** issued by that country; or

  (b) in the United States dollar equivalent of the currency in which the loss occurred determined by the rate of exchange as of 12:01 a.m. on the day the loss was discovered;

  (ii) loss of **Securities**, but only up to and including their value at the close of business on the day the loss was discovered. The **Insurer** may, at its option:

  (a) pay the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the **Insurer** all its rights, title and interest in and to such **Securities**; or

  (b) pay the cost of any Lost Instrument Bond, subject to the applicable deductible, required in connection with issuing duplicates of the **Securities**. However, the **Insurer** will be liable only for payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of:

    i. the value of the **Securities** at the close of business on the day the loss was discovered; or

    ii. the Limit of Liability of this Crime Coverage Section;

  (iii) loss of, or loss from damage to, **Other Property** including damage to the **Premises** for not more than:

  (a) the actual cash value of the property on the day the loss was discovered;

  (b) the cost of repairing the property or **Premises**; or

  (c) the cost of replacing the property with property of like kind and quality.

The **Insurer** may, at its option, pay the actual cash value of the property or repair or replace it. If the **Insurer** cannot agree with the **Insured** upon the actual cash value or the cost of repair or replacement, the value or cost of repair or replacement will be determined by arbitration in accordance with the rules of the American Arbitration Association.

SL-15195

With respect to loss of or damage to electronic data, books of account or other records, tapes, disks or similar electronic media, the **Insurer** will only pay for the cost of blank books, blank pages, blank tapes, or blank disks, plus the cost of labor and computer time for the actual transcription or copying of data furnished by the **Insured** in order to reproduce such data, books, records, tapes, disks or similar electronic media.

b) The **Insurer** may, at its option, pay for loss of, or loss from damage to, property other than **Money**:

   (i) in the original currency in which the loss occurred; or

   (ii) in the United States dollar equivalent of the currency in which the loss occurred determined by the rate of exchange as of 12:01 a.m. on the day the loss was discovered.

c) Any property that the **Insurer** pays for or replaces shall become the **Insurer's** property.

5. Recoveries

   a) Any recoveries, less the reasonable cost of obtaining them, made after settlement of loss covered by this Crime Coverage Section will be distributed in the following order:

      (i) to the **Insured**, until the **Insured** is reimbursed for any covered loss that it sustained in excess of the Limit of Liability and the deductible amount, if any;

      (ii) to the **Insurer**, until it is reimbursed for all amounts paid under this Crime Coverage Section; and

      (iii) to the **Insured**, until it is reimbursed for that part of the loss equal to the deductible amount, if any.

   b) Recoveries do not include any recovery:

      (i) from insurance, suretyship, reinsurance, security or indemnity taken for the **Insurer's** benefit; or

      (ii) of original **Securities** after duplicates of them have been issued.

6. Legal Action against the **Insurer**

   The **Insured** may not bring any legal action against the **Insurer** involving a claimed loss:

   a) until ninety (90) days after the **Insured** has filed a sufficient proof of loss with the **Insurer**;

   b) unless the **Insured** has complied with all of the terms of the **Policy**; and

   c) unless brought within two (2) years from the date the **Insured** discovered the loss.

F.  **GENERAL TERMS AND CONDITIONS SECTION**

   Subsection H. and I. of the General Terms and Conditions section of the **Policy** shall not apply to this Crime Coverage Section.

G.  **EMPLOYEE BENEFIT PLAN**

   In compliance with certain provisions of the Employee Retirement Income Security Act of 1974, as amended (ERISA):

   1. If the **Insured** first named in Item A. of the Declarations is an entity other than the **Employee Benefit Plan**, any payment the **Insurer** makes for loss sustained by any **Employee Benefit Plan** will be held by that **Insured** for the use and benefit of the **Employee Benefit Plan** sustaining the loss.

SL-15195

Page 9 of 10



2. If two or more **Employee Benefit Plans** are **Insured** under this insurance, any payment the Insurer makes for loss:

   a)  sustained by two or more **Employee Benefit Plans**; or

   b)  of commingled funds or other property of two or more **Employee Benefit Plans**

   is to be shared by each **Employee Benefit Plan** sustaining loss in the proportion that the amount of insurance required for each such **Employee Benefit Plan** under ERISA bears to the total of those amounts.

3. The deductible applicable to any Insuring Clause does not apply to loss sustained by any **Employee Benefit Plan** covered under this Crime Coverage Section that is subject to ERISA.

SL-15195

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Focus Management, Inc | | | 1 |
| Policy Symbol | Policy Number | Policy Period | Effective |
| BMI | 20044594 | July 1, 2007      to     July 1, 2008 | July 1, 2007 |
| Issued By (Name of Insurance Company) | | | |
| Illinois Union Insurance Company | | | |

AMEND EXCLUSION N. $100 MM

It is agreed that Section C., Exclusions, subsection 1., paragraph n. iii. of the Directors & Officers and Company Coverage Section is deleted in its entirety and the following is inserted:

iii.   any debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $100 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3(b) of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in connection with such issuance of securities and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

All other terms and conditions of this **Policy** remain unchanged.

SL-20863 (09/06)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | | Endorsement Number<br>**2** |
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | | |

### Amend Notice of Circumstances

It is agreed that Section E, subsection 2 of the Directors and Officers and Company Coverage Section is deleted in its entirety and the following is inserted:

2.  If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a.  a description of the facts or circumstances allegations anticipated;

   b.  the identity of the potential claimants;

   c.  the circumstances by which the **Insureds** first became aware of the facts or circumstances;

   d.  the identity of the **Insureds** allegedly involved;

   e.  the consequences which have resulted or may result; and

   f.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

SL-19595 (1/06)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | | Endorsement Number<br>3 |
|---|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | | |

### Amend Notice of Circumstances-EPL

It is agreed that Section E., subsection 2. of the Employment Practices Coverage Section is deleted in its entirety and the following is inserted:

2.  If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a.  a description of the facts or circumstances allegations anticipated;

   b.  the identity of the potential claimants;

   c.  the circumstances by which the **Insureds** first became aware of the facts or circumstances;

   d.  the identity of the **Insureds** allegedly involved;

   e.  the consequences which have resulted or may result; and

   f.  the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**.  No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

SL-19625 (1/06)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>**4** |
|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

**Amend Notice Provision- DO**

It is agreed that Section E, Notification, subsection 1 of the Directors and Officers and Company Coverage Section is amended to add the following:

> A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

SL-19596 (1/06)

Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>5 |
|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

**Amend Notice Provision- EPL**

It is agreed that Section E, Notification, subsection 1 of the Employment Practices Coverage Section is amended to add the following:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

SL-19594 (1/06)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>Focus Management, Inc | | | Endorsement Number<br>6 |
|---|---|---|---|
| Policy Symbol<br>BMI | Policy Number<br>20044594 | Policy Period<br>July 1, 2007   to   July 1, 2008 | Effective<br>July 1, 2007 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

## Amend Outside Services Exclusion

It is agreed that Section C, Exclusions, subsection 1, paragraph (j), subparagraph (ii) of the Directors & Officers and Company Coverage Section is deleted in its entirety and the following is inserted:

> (ii)   such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**, or is unable to indemnify such **Directors and Officers** as a result of **Financial Impairment**; and

For the purposes of this endorsement **Financial Impairment** means the status of the **Company** resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Company**, or (2) the **Company** becoming a debtor in possession.

All other terms and conditions of this **Policy** remain unchanged.

SL-19590 (1/06)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>**7** |
|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>July 1, 2007 |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

### AMEND THIRD PARTY

It is agreed that Section B, Definitions, subsection 12, of the Employment Practices Coverage Section is deleted in its entirety and the following is inserted:

   12. **Third Party** means any customer, client, or other group or natural person other than an **Employee** or applicant for employment with the **Company.**

All other terms and conditions of this **Policy** remain unchanged.

SL-19600 (1/06)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>**8** |
|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2008** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

**Non-Rescindable Side A Endorsement**

It is agreed that subparagraph 2 of the second paragraph of Section D, Warranty, of the General Terms and Conditions, is amended to add the following:

Provided, however, that solely with respect to the coverage afforded under Section A, Insuring Clauses, subsection 1, of the Directors & Officers and Company Coverage Section, the **Insurer** shall not seek to rescind this **Policy**.

All other terms and conditions of this **Policy** remain unchanged.

SL-19588 (1/06)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>**9** |
|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## PROFESSIONAL SERVICES EXCLUSION-SECURITIES HOLDER EXCEPTION

It is agreed that Section C., Exclusions, subsection 1. of the Directors & Officers and Company Coverage Part is amended by adding the following:

p.   alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failing to render professional services. Provided, however, this exclusion shall not apply to any **Claim(s)** brought by a securities holder of the **Company** in their capacity as such.

All other terms and conditions of this **Policy** remain unchanged.

SL-20108 (04/06)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| | | | |
|---|---|---|---|
| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>**10** |
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## REMOVAL OF ALTERNATIVE DISPUTE RESOLUTION PROVISION

It is agreed that Section **J**, Alternative Dispute Resolution, of the General Terms and Conditions Section is deleted in its entirety.

All other terms and conditions of this **Policy** remain unchanged.

SL-19592 (1/06)

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured<br>**Focus Management, Inc** | | | Endorsement Number<br>**11** |
|---|---|---|---|
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Illinois Union Insurance Company** | | | |

## SCIENTIFIC AND ADVISORY BOARD EXTENSION

It is agreed that Section B, Definitions, subsection 4, of the Directors and Officers and Company Coverage Section is amended to add the following:

    d.  A natural person member of the Scientific or Advisory Board of the **Company** (collectively, "**Advisory Board Members**") that is indemnified by the **Company** pursuant to a written indemnification agreement.  The **Company** agrees to indemnify the **Advisory Board Members** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract.  The **Company** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any **Advisory Board Member** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Advisory Board Member** to indemnification, where permitted by law to do so.  The financial ability of any Advisory Board Member to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right.  The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the **Advisory Board Member**.

All other terms and conditions of this **Policy** remain unchanged.

SL-19602 (1/06)

Page 1 of 1

| Named Insured | | | | Endorsement Number |
|---|---|---|---|---|
| Focus Management, Inc | | | | 12 |
| Policy Symbol | Policy Number | Policy Period | | Effective |
| BMI | 20044594 | July 1, 2007  to  July 1, 2008 | | July 1, 2007 |
| Issued By (Name of Insurance Company) | | | | |
| Illinois Union Insurance Company | | | | |

## SERVICE OF SUIT ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Information about service of "suits" upon us is given below. Service of process of "suits" against us may be made upon the following person, or another person we may designate:

> Saverio Rocca, Assistant General Counsel
> ACE USA Companies
> 436 Walnut Street – WA04K
> Philadelphia, PA 19106

The person named above is authorized and directed to accept service of process on our behalf in any action, "suit" or proceeding instituted against us. If you request, we will give you a written promise that a general appearance will be entered on our behalf if a "suit" is brought.

If you request, we will submit to the jurisdiction of any court of competent jurisdiction. We will accept the final decision of that court or any Appellate Court in the event of an appeal.

The law of some jurisdictions of the United States of America require that the Superintendent, Commissioner or Director of Insurance (or their successor in office) be designated as our agent for service of process. In these jurisdictions, we designate the Director of Insurance as our true and lawful attorney upon whom service of process on our behalf may be made. We also authorize the Director of Insurance to mail process received on our behalf to the company person named above.

If you are a resident of Canada, you may also serve "suit" upon us by serving the government official designated by the law of your province.

NOTHING HEREIN CONTAINED SHALL BE HELD TO VARY, ALTER, WAIVE OR EXTEND ANY OF THE TERMS, CONDITIONS, OR LIMITATIONS OF THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED OTHER THAN AS ABOVE STATED.

XS-1U96d (02/06)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| | | | Endorsement Number |
|---|---|---|---|
| Named Insured<br>**Focus Management, Inc** | | | **13** |
| Policy Symbol<br>**BMI** | Policy Number<br>**20044594** | Policy Period<br>**July 1, 2007  to  July 1, 2008** | Effective<br>**July 1, 2007** |
| Issued By (Name of Insurance Company)<br>**Westchester Fire Insurance Company** | | | |

### SINGLE AGGREGATE LIMIT OF LIABILITY
Employment Practices Coverage Section
Directors & Officers Coverage Section

It is agreed that:

1.  The Declarations page is amended to include the following:

    Item I. Limit of Liability $3,000,000 in the aggregate for this **Policy** for Employment Practices and Directors & Officers Coverage Sections.

2.  Section C LIMITS OF LIABILITY AND RETENTIONS of the General Terms and Conditions section is deleted in its entirety and replaced with the following:

    C.  LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES

    1.  The Limits of Liability, Retentions and Deductibles for the Employment Practices Coverage Section, and the Directors & Officers Coverage Section, are not separate Limits of Liability pertaining to the Coverage Section for which they are shown and are subject to the maximum aggregate limit of liability shown in Item I. of the Declarations. The amount shown in Item I. of the Declarations shall be the maximum aggregate Limit of Liability applicable to the Employment Practices Coverage Section, and the Directors & Officers Coverage Section. The reduction in the Limit of Liability in one of these Coverage Sections shall reduce the limit of liability available for the other Coverage Section. The Limits of Liability for the Fiduciary Coverage Section and the Crime Coverage Section is a separate Limit of Liability from the single aggregate Limit of Liability for the Employment Practices Coverage Section, and the Directors & Officers Coverage. The reduction in the Limit of Liability applicable to the Fiduciary Coverage Section and the Crime Coverage Section shall not reduce the single aggregate Limit of Liability under the Employment Practices Coverage Section, and the Directors & Officers Coverage Section. The Retentions for each Coverage Section are separate retentions for which they are shown. The application of retention to **Loss** under one Coverage Section shall not reduce the retention under any other Coverage Section.

    2.  In the event that any **Claim** or more than one **Claim** arising for **Interrelated Wrongful Acts** shall be covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. Such largest applicable Retention or Deductible shall apply only once to such **Claim.**

All other terms and conditions of this **Policy** remain unchanged.

SL-18349 [EPL/DO] (4/05)

Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Focus Management, Inc | | | 14 |
| Policy Symbol | Policy Number | Policy Period | Effective |
| BMI | 20044594 | July 1, 2007  to  July 1, 2008 | July 1, 2007 |
| Issued By (Name of Insurance Company) | | | |
| Illinois Union Insurance Company | | | |

### WARRANTY AMENDMENT

It is agreed that Section D. of the General Terms and Conditions is amended as follows:

D.   It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1.   the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2.   in the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio only with respect to any **Insureds** who had knowledge of such misrepresentation or omission.

All other terms and conditions of this **Policy** remain unchanged.

SL-20106 (04/06)

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

| Named Insured<br>Focus Management, Inc | | Endorsement Number<br>15 |
|---|---|---|
| Policy Symbol<br>BMI | Policy Number<br>20044594 | Policy Period<br>July 1, 2007  to  July 1, 2008 | Effective<br>July 1, 2007 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | |

### ADDITIONAL PARENT COMPANY

It is agreed that Item A. of the Declarations, Parent Company, is amended by adding the following:

Focus Development, Inc.
FCI of Florida, Inc.
Focus Builders, Inc.

It is further agreed that solely as respects the coverage extended by this endorsement shall only apply to the Crime Coverage Section.

All other terms and conditions of this **Policy** remain unchanged.

SPEC001

Page 1 of 1

 

POLICYHOLDER DISCLOSURE
NOTICE OF TERRORISM
INSURANCE COVERAGE

This endorsement applies only to insurance provided under the following:

Business and Management Indemnity Policy

Employment Practices Coverage Section

You should be aware that under the Terrorism Risk Insurance Act of 2002 ("The Act") effective November 26, 2002, any losses caused by certified acts of terrorism under your existing coverage may be partially reimbursed by the United States under a formula established by federal law (applicability is subject to the terms and conditions of each individual policy). The Act was specifically designed to address the ability of businesses and individuals to obtain property and casualty insurance for terrorism and to protect consumers by addressing market disruptions and ensure the continued availability of terrorism coverage.

Under the terms of The Act, you may now have the right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Responsibility for Compensation under The Act is shared between insurance companies covered by The Act and the United States. Under the formula set forth in The Act, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible, which is paid by the insurance company providing the coverage.

We are providing you with the terrorism coverage required by The Act. We have not established a separate price for this coverage; however the portion of your annual premium that is reasonably attributable to such coverage is equal to the amount derived by multiplying 1% of the total premium for the coverage purchased.

Name of Insured: Focus Management, Inc

Policy No. BMI20044594

Terrorism Risk Insurance Act premium:  $39.79

TRIA [EPL] (08/06)

 

### POLICYHOLDER DISCLOSURE
### NOTICE OF TERRORISM
### INSURANCE COVERAGE

This endorsement applies only to insurance provided under the following:

Business and Management Indemnity Policy

Directors & Officers and Company Coverage Section

You should be aware that under the Terrorism Risk Insurance Act of 2002 ("The Act") effective November 26, 2002, any losses caused by certified acts of terrorism under your existing coverage may be partially reimbursed by the United States under a formula established by federal law (applicability is subject to the terms and conditions of each individual policy). The Act was specifically designed to address the ability of businesses and individuals to obtain property and casualty insurance for terrorism and to protect consumers by addressing market disruptions and ensure the continued availability of terrorism coverage.

Under the terms of The Act, you may now have the right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Responsibility for Compensation under The Act is shared between insurance companies covered by The Act and the United States. Under the formula set forth in The Act, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible, which is paid by the insurance company providing the coverage.

We are providing you with the terrorism coverage required by The Act. We have not established a separate price for this coverage; however the portion of your annual premium that is reasonably attributable to such coverage is equal to the amount derived by multiplying 1% of the total premium for the coverage purchased.

Name of Insured: Focus Management, Inc

Policy No. BMI20044594

Terrorism Risk Insurance Act premium: $20.15

TRIA [DO] (08/06)

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004



## ACE Producer Compensation
## Practices & Policies

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents. You can obtain that information by accessing our website at http://www.aceproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

MICHAEL J. BLONDER,                        :
BRADLEY G. JOHNSON                         :
FOCUS LAND INVESTORS, LLC, and             :
FOCUS DEVELOPMENT, INC.                    :
                                           :
        Plaintiffs,                        :
                                           :          CIVIL ACTION
v.                                         :          FILE NO. _2012CV213789_
                                           :
ILLINOIS UNION INSURANCE                   :
COMPANY,                                   :
                                           :
        Defendant.                         :
                                           :

### SUMMONS

TO THE ABOVE NAMED DEFENDANT:

        You are hereby summoned and required to file with the Clerk of said court
and serve upon the Plaintiff's attorney, whose name and address is:

        H. Michael Dever, Esq.
        Friedman, Dever & Merlin, LLC
        5555 Glenridge Connector
        Suite 925, Glenridge Highlands
        Atlanta, Georgia 30342-4728

an answer to the Complaint which is herewith served upon you, within 30 days after
the service of the summons upon you, exclusive of the date of service. If you fail to
do so, judgment by default will be taken against you for the relief demanded in the
Complaint.

This _____10th_____ day of _____April_____, 2012.

                                Cathelene Robinson
                                Clerk of the Superior Court

                                By_____Tracey Vaughn_____
                                    Deputy Clerk

To Defendant upon whom this petition is served:
This copy of complaint and Summons was severed upon you _____, 2012.

                                _____
                                **Deputy Sheriff**

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

MICHAEL J. BLONDER,           :
BRADLEY G. JOHNSON            :
FOCUS LAND INVESTORS, LLC, and :
FOCUS DEVELOPMENT, INC.       :
                              :
        Plaintiffs,           :
                              :
v.                            :        CIVIL ACTION
                              :        FILE NO. ___2012CV213789___
ILLINOIS UNION INSURANCE      :
COMPANY,                      :
                              :
        Defendant.            :
_____:

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:

        You are hereby summoned and required to file with the Clerk of said court
and serve upon the Plaintiff's attorney, whose name and address is:

                H. Michael Dever, Esq.
                Friedman, Dever & Merlin, LLC
                5555 Glenridge Connector
                Suite 925, Glenridge Highlands
                Atlanta, Georgia 30342-4728

an answer to the Complaint which is herewith served upon you, within 30 days after
the service of the summons upon you, exclusive of the date of service. If you fail to
do so, judgment by default will be taken against you for the relief demanded in the
Complaint.

This _____10th_____ day of _____April_____, 2012.

                        Cathelene Robinson
                        Clerk of the Superior Court

                        By_____Tracey Vaughn_____
                            Deputy Clerk

To Defendant upon whom this petition is served:
This copy of complaint and Summons was severed upon you _____, 2012.

                        _____
                        Deputy Sheriff





TO:        ALL JUDGES, CLERKS OF COURT AND COUNSEL OF RECORD

FROM:      GENEVIEVE H. DAME

RE:        NOTICE OF LEAVE OF ABSENCE

DATE:      May 11, 2012

COMES NOW, GENEVIEVE H. DAME and respectfully notifies all judges before whom she has cases pending, all affected clerks of court, and all opposing counsel, that she will be on leave pursuant to Georgia Uniform Court Rule 16.

**May 7, 2012 through June 18, 2012**

The purpose of the leave is petitioner will be on maternity leave.

2.       All affected opposing counsel shall have ten days from the date of this Notice to object to it.  If no objections are filed, the leave shall be granted.

3.       Each of the cases listed on Exhibit "A" attached shall be protected by said leave of absence.

Respectfully submitted,
FRIEDMAN, DEVER & MERLIN, LLC

By: _____
Genevieve H. Dame
Georgia Bar No. 142229

5555 Glenridge Connector
Suite 925
Atlanta, GA  30342
404-236-8600

**EXHIBIT A**

| TO: | RE: |
|---|---|
| Ms. Cathelene Robinson<br>Clerk, Superior Court of Fulton County<br>136 Pryor Street, SW<br>Atlanta, GA  30303<br><br>Honorable T. Jackson Bedford Jr.<br>Fulton County Superior Court<br>T4955 Justice Center Tower<br>185 Central Avenue S.W.<br>Atlanta, GA 30303 | **Michael J. Blonder, Bradley G. Johnson, Focus Land Investors, LLC and Focus Development, Inc. v. Illinois Union Insurance Company**<br><br>Superior Court of Fulton County<br>Civil Action File 2012-CV-213789 |

#2012CV213789

TO:        ALL JUDGES, CLERKS OF COURT AND COUNSEL OF RECORD

FROM:      H. MICHAEL DEVER

RE:        NOTICE OF LEAVE OF ABSENCE

DATE:      May 1, 2012

*FILED IN OFFICE*
*MAY - 2 2012*
*DEPUTY CLERK SUPERIOR COURT*
*FULTON COUNTY, GA*

COMES NOW, H. MICHAEL DEVER and respectfully notifies all judges before whom he has cases pending, all affected clerks of court, and all opposing counsel, that he will be on leave pursuant to Georgia Uniform Court Rule 16.

**May 12, 2012 through May 22, 2012**

**July 7, 2012 through July 17, 2012**

The purpose of the leave is petitioner will be on personal vacation.

2.     All affected opposing counsel shall have ten days from the date of this Notice to object to it.  If no objections are filed, the leave shall be granted.

3.     Each of the cases listed on Exhibit "A" attached shall be protected by said leave of absence.

Respectfully submitted,
FRIEDMAN, DEVER & MERLIN, LLC

By: _____
       H. Michael Dever
       Georgia Bar No. 219785

5555 Glenridge Connector
Suite 925
Atlanta, GA  30342
404-236-8600

**EXHIBIT A**

| TO: | RE: |
|---|---|
| Ms. Cathelene Robinson<br>Clerk, Superior Court of Fulton County<br>136 Pryor Street, SW<br>Atlanta, GA  30303<br><br>Honorable T. Jackson Bedford Jr.<br>Fulton County Superior Court<br>T4955 Justice Center Tower<br>185 Central Avenue S.W.<br>Atlanta, GA 30303 | **Michael J. Blonder, Bradley G. Johnson, Focus Land Investors, LLC and Focus Development, Inc. v. Illinois Union Insurance Company**<br>Superior Court of Fulton County<br>Civil Action File 2012-CV-21378 |